**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>     vs.<br><br>WILLIAM JOHN GREEN,<br><br>               Defendant. | CASE NO. 11cr938-LAB<br><br>**ORDER DENYING:**<br><br>**1) EMERGENCY MOTION FOR RELEASE PENDING APPEAL [Dkt. 329];**<br><br>**2) MOTION FOR EVIDENTIARY HEARING [Dkt. 329]; and**<br><br>**3) MOTION TO GRANT REDUCTION IN SENTENCE [Dkt. 342]** |

In September 2020, the Court sentenced William Green to eighteen months in custody after finding that he violated supervised release by accessing pornographic material on his cell phone. Green was on supervised release following his conviction for possessing child pornography.

Green didn't admit the violation, so the court conducted an evidentiary hearing to resolve the allegations. Evidence presented at the hearing established that Green's personal cell phone had been used to access a

pornographic website. Green testified that he wasn't the one using the phone. Instead, the real culprit was a "very distraught and crying" woman, (Dkt. 311 at 24:9–10), whom Green encountered near his apartment and invited in. Green said he knew the woman as one of his "counseling clients," and that her name was either Sasha Gonzalez or Sasha Thomas. (*Id.* at 27:24–25.) Although Green knew "Sasha" was a recovering drug addict, he offered her wine. He also consumed wine, then he fell asleep. (*Id.* at 25:1–4.) Supposedly while Green slept, Sasha accessed his phone (which he was wasn't sure was locked or unlocked) (*see id.* at 27:13–15, 26:7–10), logged on to Amazon.com using Green's account number, purchased "at least two" sex toys, (*id.* at 26:3–6), cast videos from Green's phone to the TV in his master bedroom, (*id.* at 19:2–20), searched a pornographic website for videos involving dead women, sex dolls, and a type of men's sex toy, (*id.* at 17:4–25; Gov't Ex. 6, attached as Ex. A to this Order (showing Green's phone accessed http://xnxx.com/search/ silicone+Sex+doll)), and finally searched eBay for the same type of men's sex toy. (Ex. A (Green's phone accessed a website titled "fleshlight | eBay").) Green assertedly woke up around midnight, reclaimed his phone, kicked Sasha out of the apartment, and cancelled the Amazon orders. (*Id.* at 25:14–26:6.).

After hearing Green out, the Court, as trier of fact, determined that his version of the events was untruthful—or at a bare minimum, a complete confabulation. Indeed, each link in chain of events Green related made his story less plausible. The Court concluded that Green's testimony was "incredible," and that he, not "Sasha" had accessed the pornographic website. Accordingly, the Court revoked his supervised release and imposed an 18-month sanction. (*Id.* at 35:3–37:23.). Green, who is scheduled to be released in November 2021, now seeks early release pending appeal.

To warrant release while his appeal of a supervised release revocation is pending, Green must show that "exceptional circumstances" exist. *U.S. v.*

*Bell*, 820 F.2d 980, 981 (9th Cir. 1987). This is an "extremely demanding test" satisfied only in "extraordinary case[s]." *U.S. v. Loya*, 23 F.3d 1529, 1531 (9th Cir. 1994). It's "substantially stricter" than the standard applicable where the defendant appeals his conviction or original sentence. *Id.*

Green's past deception—under oath, no less—make it harder for him to meet this standard. And it becomes harder still when there's evidence that Green continues to try to deceive the Court, by first asking his physicians to get in on the act, and then by trying to coerce them with litigation threats:

> [Green] came to clinic today (unscheduled) insisting that we have to write something that he can be release[d] from prison! He was in my office last week as well for the same issues. [H]e says that he did his time and next 2 months is too much for him! He was explained that we don't judge our patients, all we do is medical care, he says that I have to write something and print for him, so the judge will release him! He is again here regarding his RIS denial. He states that he should be go home because of possibility of covid-19 infection. SARS CoV 2 RNA NOT DETECTED on 6-18-2021 as well as 07-22-0221.
> . . .
> Although his RIS was denied, inmate end of sentence is (11/11/21), he was told again and again that request and reapply for RIS should be submitted. He says that sued the Federal [*sic*] once and he may ha[ve] to do it again because he doesn't like his current NP and assigned physician and want[s] other providers!

(Def. Med. Records ("DMR"), Dkt. 348 at 2.)[1]

The Court is reluctant to credit Green's uncorroborated statements, given his history of lying under oath and his recent attempt to coerce others into

---

[1] As discussed below, Green maintains that his provider later apologized for writing these statements in Green's medical notes, but he offers only his own hearsay assertions to support his claim.

creating misleading medical records to secure his release. So, while Green argues that his health, his medical care in BOP custody, and the danger of COVID-19 reinfection all warrant his release, (*see* Dkt. 329), the Court has looked for support for those claims only outside Green's affidavits. The reliable evidence offers little to corroborate and much to contradict his claim that he must be released due to extraordinary medical need.

### A. Green's COVID Risk Doesn't Warrant His Release

The pandemic has resurged since the Court denied Green's first two motions for compassionate release in a May 13, 2021 Order.[2] But Green could mitigate that risk by taking the vaccination that he has thus far refused. (DMR at 2, 316.)

He asserts that he "cannot be safely vaccinated" because he is "[i]mmune [c]ompromise[d]," (Dkt. 329 at 3), but there are at least three glaring flaws in this assertion. First, there's nothing in his medical records to corroborate the claim of immunocompromise.[3] Second, his physicians don't appear to have recommended that he not be vaccinated—to the contrary, they offered him a vaccine. (Dkt. 341 at 3; DMR at 2, 316.) And third, the claim that

---

[2] *See* Center for Disease Control, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, https://covid.cdc.gov/covid-data-tracker/#trends_dailycases (last accessed August 24, 2021) (showing nationwide new case 7-day moving averages of 33,865 on May 13, 2021 and 124,383 on August 22, 2021).

[3] Green asserts that his immunocompromise results from his having contracted COVID three times, "with concurrent MRSA, pneumonia, strep-blood, and urinary tract infections." (Dkt. 341 at 3.) But of these maladies, only a urinary tract infection and one bout of COVID appear recent—the rest are referenced in his medical history, which itself is largely self-reported. Even so, there's no credible evidence that any of these conditions would compromise his immune system. (*See* DMR at 143 (diagnosis of urinary tract infection); *id.* at 143, 171 (mid- to late-January 2021 COVID infection); *id.* at 208 (self-reported MRSA); *id.* at 209 ("Hx [history] pneumonia").)

- 4 -

medical professionals recommended against vaccination is particularly dubious considering the CDC's recommendation that severely immunocompromised people receive *additional* vaccine doses. Center for Disease Control, *COVID-19 Vaccines for Moderately to Severely Immunocompromised People*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html (accessed August 24, 2021).

Green hasn't justified his refusal to take a simple and readily available step to reduce his risk of contracting COVID, so he can't use that self-imposed risk to support his early release from custody.

## B. Green's Medical Conditions Don't Establish Any Extraordinary Need for Release

Green argues next that six new or worsened health issues warrant his release. But while his medical records largely undermine and contradict his claims, at a minimum they show that his conditions are adequately managed:

(1) "[M]ini-stroke" (Dkt. 329 at 3): Green's medical records evidence a "TIA," which the Court understands to mean a transient ischemic attack, sometimes called a mini-stroke. But the records also reflect that such an episode represents a continuation rather than a deterioration of Green's physical condition: he "[c]laims he had similar episodes in the past." (DMR at 62–64.) The records also reflect that Green received prompt and proper medical attention for his mini-stroke under BOP care. (*Id.*)

(2) "[W]orsened heart failure" (Dkt. 329 at 3): Green identifies two primary incidents in support of his claimed worsened heart failure. First, he complained of chest pain on July 23, 2021. (DMR at 5.) He took prescribed nitroglycerin then called for a medical evaluation, and when his medical providers arrived, they observed that he "did NOT appear to be in cardiac distress." Because Green took medication first,

- 5 -

the Court can't conclude that he "faked [a] cardiac episode[]," as the Government argues. (Dkt. 338 at 3.) But Green's immediate access to medication and treatment indicates that his cardiac issues have been and are being adequately managed, so those issues don't require his immediate release.[4]

The second incident, relayed in Green's August 15, 2021 supplemental brief, is a purported cardiac event on August 12, 2021 for which, he argues, he received substandard care. But the Court doesn't have any record of this incident beyond Green's word and a medical readout that the Court can't interpret without expert assistance. (*See* Dkt. 350.) For the reasons already discussed, that's not enough. And while Green states that his physician "is advocating for Green's early release" and that the warden "told Green that she was expediting review of Green's RIS . . . [and] agreed that Green needed to be off the compound ASAP," he doesn't identify any hearsay exception that would allow the Court to rely on these purported statements.

(3) "[S]evere Post COVID . . . Syndrome" (Dkt. 329 at 3): Green's medical records don't support the claim that he has been diagnosed with post-COVID syndrome. On the contrary, one provider concluded that Green's "chronic fatigue" was "not associated with COVID 19 infection." (DMR at 258; Dkt. 318 at 28 (self-diagnosis of post-COVID syndrome).) Nor does he explain how this condition is an emergency or would be better addressed outside of custody. Green hasn't

---

[4] Green's medical records also indicate that he "signed [a] refusal to take medication recommended by [his] cardiologist" and was "noncompliant with multiple orders and referrals." (DMR at 220.)

1    established either that he has post-COVID syndrome or that such a

2    condition would be an extraordinary circumstance warranting release.

3    (4) "Suspicious new skin-cancer lesions" (Dkt. 329 at 4): While Green

4    may be concerned that his skin lesions are cancerous, there's been

5    no such diagnosis. He was referred to a dermatologist to "R[ule]/O[ut]"

6    skin cancer, an examination he apparently received before June 21,

7    2021, (*see* DMR at 88; *id.* at 30 (referring to "recent evaluation by

8    Dermatology")), but Green offers no evidence beyond his word that

9    he has skin cancer.

10    (5) "Suspicious new mass in right lung" (Dkt. 329 at 4): Green appears to

11    have a mass in his lung, which his radiologist deemed a "possible

12    calcified nodule." (DMR at 96, 462.) That physician recommended

13    monitoring the mass with a follow-up chest x-ray between September

14    2021 and March 2022—an endpoint four months after Green's

15    scheduled release. In other words, there's no emergency, even if

16    Green could provide evidence that this is a serious condition.

17    (6) Kidney disease (Dkt. 341 at 4): Green had "high creatinine levels" in a

18    test performed in January 2021. (DMR at 97, 131.) But subsequent

19    tests found that that level had "reduced." (*Id.* at 97.) Once again,

20    there's no apparent emergency and Green appears to be receiving

21    adequate medical care and monitoring.

22    Despite being seen or treated by BOP doctors for each of the above

23 complaints, Green nevertheless argues he isn't receiving adequate care in

24 custody because he has been referred to, but hasn't seen, six specialists: a

25 cardiologist; a neurologist; a nephrologist; a dermatologist; a gastro-

26 enterologist; and a podiatrist. But he *has* seen a dermatologist, (DMR at 30,

27 32), and there's no evidence that any of the other referrals are urgent or

28 overdue. (DMR at 32, 36, 103, 226–27 (classifying referrals as "Routine" or

"Medically Necessary – Non-Emergent"); *id*. at 22, 32, 36 (target dates for cardiology, nephrology, podiatry, and gastroenterology consultations on or after September 1, 2021).)

Even if Green had shown a serious health concern, he offers no reliable evidence to support his claim that early release is necessary to address his health concerns. More specifically, there's no evidence that Green's medical issues result from him being incarcerated. Likewise, Green has presented no credible evidence that he would receive better care outside of custody, nor that his conditions are so emergent that he needs hypothetically better medical care before his appeal resolves or BOP releases him in three months. In sum, he hasn't presented any reliable evidence to establish that exceptional circumstances exist to support his release pending appeal of his supervised release revocation. *See Bell*, 820 F.2d at 981.

## CONCLUSION

Neither Green's claimed conditions nor his COVID-19 risk are enough to free him from custody while his appeal is pending.[5] His Motion for Release Pending Appeal is **DENIED**. (Dkt. 329.) If Green can document his physician's recommendation that he be released, if BOP hasn't given him the opportunity to be examined by a cardiologist, neurologist, nephrologist, gastroenterologist, and podiatrist within 30 days of this Order, or if BOP hasn't offered adequate reasons why such outside medical referrals are not indicated or necessary by that time, he may move for reconsideration of this denial. Any such motion to

---

[5] The Court has reviewed and considered Green's August 10, 2021 Supplemental Reply Brief, too. That brief largely repeats Green's prior arguments and provides nothing to rehabilitate his credibility. What little argument it adds appears designed to undermine his physicians' credibility. Even if Green could successfully discredit his physicians based on his word alone, he would be discrediting the only otherwise-reliable evidence available to help him meet his burden of showing extraordinary circumstances.

1   reconsider must be supported by credible evidence that: 1) Greene can't

2   receive or isn't receiving adequate care in custody; 2) the unaddressed issues

3   are sufficiently serious that they must be adequately addressed before

4   resolution of Green's appeal or his November release, whichever would come

5   first; and 3) Green would have prompt access to adequate care once released.

6           Green also moved for an evidentiary hearing. The Court finds that a

7   hearing wouldn't be productive—even if Green succeeded in discrediting his

8   physicians, as he proposes to try, he would have no credible evidence to help

9   him meet his burden. Nor does Green identify any authority entitling him to an

10  evidentiary hearing on a motion for release pending appeal of a revocation of

11  supervised release. The motion for an evidentiary hearing is **DENIED**.

12  (Dkt. 341 at 2.)

13          For the same reasons Green hasn't shown that this is an "extraordinary

14  case" warranting release pending appeal, *Loya*, 23 F.3d at 1531, he hasn't

15  shown "extraordinary and compelling reasons" for a reduction in sentence. 18

16  U.S.C. § 3582(c)(1)(A)(i).[6] His third Motion to Grant a Reduction in Sentence

17  is **DENIED**. (Dkt. 342; *see also* Dkt. 321 (finding that factors under 18 U.S.C.

18  § 3553(a) don't support reduction in Green's sentence).)[7]

19          The Court won't consider further supplemental briefing submitted in this

20  case without the Court's leave—any such filings will be summarily rejected.

21          **IT IS SO ORDERED**.

22  Dated: August 24, 2021

23  _____
    **HONORABLE LARRY ALAN BURNS**
24  United States District Judge

---

25  [6] The Court incorporates the findings from its earlier order denying relief under
26  § 3582(c)(1)(A)(i).

27  [7] Green purports to have filed a preemptive "provisional notice of appeal."
    (Dkt. 341 at 1.) Whether that notice complies with the Federal Rules of
28  Appellate Procedure is a question for the appellate court.